**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 07 2013, 8:26 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**STEVEN KNECHT**
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD C. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| Q.P., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 79A02-1207-JV-609 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Faith Graham, Magistrate
Cause No. 79D03-1204-JD-73

**March 7, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BARTEAU, Senior Judge**

## STATEMENT OF THE CASE

Q.P. appeals the juvenile court's order awarding wardship of him to the Indiana Department of Correction ("DOC") for housing in a correctional facility for children. We affirm.

## ISSUE

Q.P.'s sole issue on appeal is whether the juvenile court abused its discretion in awarding wardship of him to the DOC.

## FACTS AND PROCEDURAL HISTORY

In December 2011, fourteen-year-old Q.P. told thirteen-year-old A.B. that he loved her and repeatedly asked her to show him her breasts. A.B. finally complied while on FaceTime, and Q.P. took a screenshot without her knowledge.

Q.P. showed A.B.'s picture to other students at their school and blackmailed her for several months. In April 2012, Q.P. told A.B. he would delete the picture if she did something with him. A.B. met Q.P. and discovered he had invited two other boys, C.S. and S.K. Q.P. grabbed A.B. by the arm and told her he would pick her up and carry her if she did not go. They walked to a wooded area. A.B. tried to leave, but they would not let her.

A.B. was sexually assaulted for forty-five minutes. During that time, Q.P. fondled A.B., digitally penetrated her vagina, put his mouth on her breasts, and spanked her. He also used his phone to record A.B. being forced to perform oral sex on C.S. The boys left her naked in the woods.

2

Afterward, A.B. learned that Q.P. had a video of the assault on his phone. Q.P. disseminated the video to other students, bragged about the assault, and called it "so funny." State's Ex. 4.

Q.P. later texted A.B. that he wanted to do it again and wanted one of A.B.'s girlfriends involved as well. He and C.S. threatened to put images of her online. A.B. ultimately reported the matter to police.

The State filed a petition alleging Q.P. was a delinquent child for committing seven offenses that would be crimes if committed by an adult: two counts each of Class B felony criminal deviate conduct and Class B felony child molesting, and one count each of Class C felony confinement, Class C felony child exploitation, and Class A misdemeanor intimidation. Q.P. admitted to one count of Class B felony criminal deviate conduct and Class C felony child exploitation. The juvenile court adjudicated Q.P. a delinquent child and dismissed the remaining counts on the State's motion.

Following a dispositional hearing, the juvenile court entered an order finding:

4. . . . Text messages suggest [Q.P.] has made other attempts to blackmail other female juveniles in a similar manner. [Q.P.] developed a fake [F]acebook account to assist his blackmail efforts.

5. The sexual assault was premeditated. [Q.P.] initiated a specific plan at least a week in advance to sexually assault the victim and was instrumental in executing that plan.

. . . .

9. [Q.P.] demonstrated dishonesty regarding the location and dissemination of the digitized images throughout several interviews.

10. [Q.P.] minimizes his involvement in the offense, accepts little responsibility, and reports being annoyed with his current circumstances.

11. [Q.P.]'s parents failed to monitor [Q.P.]'s activities on electronic devices and also minimized [Q.P.]'s responsibility for the offense. [Q.P.]'s parents demonstrate a lack of understanding regarding [Q.P.]'s significant sexually maladaptive behaviors and the need for restrictive supervision.

. . . .

15. [Q.P.] has participated in a number of sexually explicit conversations with at least one (1) other juvenile female.

16. [Q.P.] was dishonest regarding his prior sexual contact involving mutual oral sex with a male juvenile co-delinquent.

17. [Q.P.] was dishonest regarding his use of pornography and only recently disclosed his exposure to pornography.

18. [Q.P.] failed to submit two (2) homework assignments during initial treatment.

19. The Estimate of Risk of Adolescent Sexual Offense Recidivism (ERASOR) was administered by Missy Galbreth, LMHC, CSAYC. [Q.P.]'s score reflects a high risk for reoffending. [Q.P.]'s high risk factors include deviant sexual interests, sexual assault of the same victim more than once, threats during sexual offense, diverse sexual-assault behaviors, antisocial interpersonal orientation, interpersonal aggression, poor self-regulation of affect and behavior, lack of development or practice of a realistic prevention plan, and incomplete sexual-offense specific treatment.

20. Expert testimony of licensed clinical psychologist, Dr. Jeffrey Vanderwater-Piercy, suggests a lower risk to sexually reoffend. However, Dr. Vanderwater-Piercy confirms [Q.P.] exhibits "doubts regarding his masculinity" and "an escalating sense of hostility and anger toward females[."] Further, [Q.P.]'s offense included a "pattern of coercion" and demonstrated an "escalating pattern of sexually sadistic behavior[."]

21. Court finds [Q.P.]'s apology and expressions of remorse insincere.

Appellant's App. pp. 148-49. The juvenile court concluded that commitment to the DOC with the provision of sex offender treatment "meets the purposes of rehabilitation and is the least restrictive disposition for the safety of the community and the best interests of

the child." *Id.* at 150. It thus awarded wardship of Q.P. to the DOC for housing in a correctional facility for children. Q.P. now appeals.

## DISCUSSION AND DECISION

Q.P. contends that the juvenile court abused its discretion in awarding wardship of him to the DOC. The disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court and will only be reversed upon an abuse of that discretion. *J.S. v. State*, 881 N.E.2d 26, 28 (Ind. Ct. App. 2008). The juvenile court's discretion is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least harsh disposition. *Id.* The juvenile court is accorded wide latitude and great flexibility in dealing with juveniles. *Id.*

Indiana Code section 31-37-18-6 (1997) sets forth the following factors that a juvenile court must consider when entering a dispositional decree:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
> (1) is:
> > (A) in the least restrictive (most family like) and most appropriate setting available; and
> > (B) close to the parents' home, consistent with the best interest and special needs of the child;
> (2) least interferes with family autonomy;
> (3) is least disruptive of family life;
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

Because the statute requires placement in the least restrictive setting only if consistent with the safety of the community and the best interest of the child, it recognizes that in

certain situations the best interest of the child is better served by a more restrictive placement. *J.S.*, 881 N.E.2d at 29.

Q.P. acknowledges that he was late with two homework assignments from his counseling sessions and that he failed two polygraph examinations aimed at determining to whom he sent images of A.B. Indeed, Q.P. did not complete the assignments until after the State filed an emergency motion to take him into custody for failing to abide by the conditions of his release on electronic monitoring, and he did not pass the polygraph examination until it was administered the day before his admission hearing.

Q.P. nonetheless points out that he has since been cooperative. He notes the testimony of Missy Galbreth, his counselor, that he was making progress and that continuing his treatment program would be consistent with his best interests and the safety of the community. Q.P. also notes the testimony of Jeffrey Vanderwater-Piercy, the licensed clinical psychologist who conducted his psychosexual evaluation, disagreeing that Q.P. should be placed at the DOC and opining that his treatment could occur within a community setting with minimal risk to society. Q.P. further notes that he has no prior record and that he has a strong support system.

Even so, Galbreth also testified that Q.P. and his parents initially minimized the assault of A.B., that an assessment of Q.P. showed he had a high risk of recidivism, and that she could not tell whether Q.P. and his parents were just telling her what she wanted to hear. Vanderwater-Piercy testified that Q.P. showed an escalating sense of hostility and anger toward females, that he exhibited an escalating pattern of sexually sadistic behavior, and that he spearheaded the assault on A.B.

6

Kelly Ryan, Q.P.'s probation officer, noted that despite the fact that Q.P. had been placed in treatment with the ability to remain in the community, his failure to turn in homework assignments showed he was not taking things seriously and his failure to pass two polygraph examinations caused her concern about his ability to be truthful, honest, and cooperative with treatment. In addition, a risk assessment showed Q.P. to be at high risk due to the sexual nature of his offenses. Ryan also noted that Q.P. may have blackmailed others and did not appear remorseful:

> [Q.P.] also asked another female to send pictures of herself and when she refused saying all the guys – "you'll show all the guys and save things for blackmail," that showed that maybe he's had this behavior in the past of blackmailing others for things that he wants. He didn't show remorse for what he did, but basically bragged to another juvenile about this, thought it was funny. It appears that he wanted to carry out the same scenario with another potential victim. It's just in my opinion, you know he's not remorseful for what he's done, but rather upset that he was caught and that he's now being punished; upset that he's having privileges taken away.

Tr. p. 93. Ryan recommended placement in the DOC.

The dispositional order shows that the court considered less restrictive placements. The court noted that reasonable efforts—including GPS electronic monitoring, psychosexual adolescent assessments, and counseling—were made to prevent removal of Q.P. from his home environment. However, it stated that Q.P. needed "long-term, intensive treatment for sexually maladaptive behaviors" and that his "educational and treatment needs will be minimally met if [he] is confined to a juvenile detention facility where intensive treatment is not available." Appellant's App. p. 150. It thus awarded wardship of Q.P. to the DOC.

"In some instances, confinement may be one of the most effective rehabilitative techniques available when a juvenile is exposed to the type of placement she would encounter were she to continue with her poor behavior." *K.A. v. State*, 775 N.E.2d 382, 387 (Ind. Ct. App. 2002) (internal quotation omitted), *trans. denied*. In light of the premeditated nature of Q.P.'s offenses, his behavior pending disposition, his lack of remorse, and his high risk of recidivism, the juvenile court did not abuse its discretion by concluding that this was one of those instances.

## CONCLUSION

We therefore affirm the judgment of the juvenile court.

RILEY, J., and KIRSCH, J., concur.